# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

RICARDO L. GABINO,
       Plaintiff,

    v.                                              Case No. 05-C-0676

DR. SCOTT HOFTIEZER,
       Defendant.

## DECISION AND ORDER

Plaintiff Ricardo L. Gabino, a Wisconsin state prisoner, filed this pro se civil rights action pursuant to 42 U.S.C. § 1983. Before me are the parties' cross motions for summary judgment and plaintiff's motion to appoint counsel.

On June 23, 2005, plaintiff filed a § 1983 complaint against defendants Dodge Correctional Institution, the Wisconsin Department of Corrections, Dr. Scott Hoftiezer and Dr. George Daley. I subsequently screened the complaint and permitted plaintiff to proceed on claims that defendants were deliberately indifferent to his serious medical need and that defendants denied him medical care after he refused to sign a co-payment agreement form.

Defendants filed a motion for summary judgment on April 14, 2006, and plaintiff filed a cross motion for summary judgment on May 5, 2006. By decision and order dated March 26, 2007, defendants' motion was granted in part and denied in part, and plaintiff's motion was denied in its entirety. Specifically, I granted defendants' motion as to Dr. Daley, the Wisconsin Department of Corrections and Dodge Correctional Institution. However, I declined to dismiss plaintiff's claims against Dr. Hoftiezer.

Defendant Hoftiezer filed a renewed motion for summary judgment on April 23, 2007. Plaintiff filed a cross motion for summary judgment on May 21, 2007. Both motions are fully briefed and ready for resolution.

## I. PRELIMINARY MATTERS

Plaintiff asserts that his medical records should be disregarded because they are inadmissible. By decision and order dated March 26, 2007, I found that Dr. Hoftiezer's <u>affidavit</u> was inadmissible because plaintiff's medical records were not attached as required under Federal Rule of Civil Procedure 56(e). <u>See</u> <u>Scott v. Edinburg</u>, 346 F.3d 752, 760 n. 7 (7th Cir. 2003) ("Rule 56(e) requires that sworn or certified copies of all papers referred to in an affidavit must be attached to or served with that affidavit.") (citing 10A Charles Alan Wright, et al., <u>Federal Practice and Procedure</u> § 2272 at 379-380 & 382-84 (1998)). I did not, however, determine that plaintiff's <u>records</u> themselves were inadmissible.

Review of Dr. Hoftiezer's renewed summary judgment motion reveals that he has cured this deficiency and attached to his affidavit a copy of plaintiff's medical records. Additionally, Dr. Hoftiezer has attested that he is competent to testify to matters contained in these records, the affidavit is made on personal knowledge and it sets forth admissible facts. <u>See</u> Fed. R. Civ. P. 56(e). Therefore, I will consider Dr. Hoftiezer's affidavit when addressing the parties' cross motions for summary judgment. <u>See</u> <u>Woods v. City of Chicago</u>, 234 F.3d 979, 988 (7th Cir. 2000) (in considering a motion for summary judgment, the court may consider any materials that would be admissible or usable at trial, including properly authenticated and admissible documents).

Next, Dr. Hoftiezer argues that his motion should be considered as undisputed because plaintiff does not respond to his proposed findings of fact as required under Civil

2

Local Rule 56.2(b)(1) (E.D. Wis.). Moreover, Dr. Hoftiezer submits that plaintiff's motion for summary judgment is deficient because his proposed findings of fact do not cite to evidentiary materials in the record.

Dr. Hoftiezer is correct that plaintiff failed to respond to his proposed findings of fact by paragraph number. However, plaintiff responds to several of defendant's proposed findings and he cites to evidentiary material in the record.[1] Therefore, I decline to consider Dr. Hoftiezer's summary judgment motion as undisputed.

## II. STANDARD OF REVIEW

Summary judgment is required "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." Id. For the fact to be material, it must relate to a dispute that "might affect the outcome of the suit." Id.

Although summary judgment is a useful tool for isolating and terminating factually unsupported claims, Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986), courts should act with caution in granting summary judgment, Anderson, 477 U.S. at 255. When the

---

[1] For example, in plaintiff's proposed finding of fact number 10, he asserts that he sent a request to HSU on June 6, 2004, complaining about hernia pain. In support of his proposition, plaintiff cites Exhibit A, which is a copy of his health service request form.

3

evidence presented shows a dispute over facts that might affect the outcome of the suit under governing law, summary judgment must be denied. Id. at 248.

The moving party bears the initial burden of demonstrating that he is entitled to judgment as a matter of law. Celotex Corp., 477 U.S. at 323. Where the moving party seeks summary judgment on the ground that there is an absence of evidence to support the nonmoving party's case, the moving party may satisfy its initial burden simply by pointing out the absence of evidence. Id. at 325. Once the moving party's initial burden is met, the nonmoving party must "go beyond the pleadings" and designate specific facts to support each element of the cause of action, showing a genuine issue for trial. Id. at 323-24. Neither party may rest on mere allegations or denials in the pleadings, Anderson, 477 U.S. at 248, or upon conclusory statements in affidavits, Palucki v. Sears, Roebuck & Co., 879 F.2d 1568, 1572 (7th Cir. 1989).

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., Ltd., 475 U.S. 574, 587 (1986). However, it is "not required to draw every conceivable inference from the record - only those inferences that are reasonable." Bank Leumi Le-Israel, B.M. v. Lee, 928 F.2d 232, 236 (7th Cir. 1991).

The fact that both parties have moved for summary judgment, and thus both parties simultaneously are arguing that there is no genuine issue of fact, does not establish that a trial is unnecessary or empower me to enter judgment as I see fit. See 10A Charles Alan Wright et al., Federal Practice and Procedure § 2720 at 327-28 (3d ed. 1998). I may grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law on the basis of the material facts not in dispute. See Mitchell v. McCarty, 239 F.2d 721,

723 (7th Cir. 1957). Cross motions for summary judgment do not convert a dispute into a question of law if material factual questions are involved and additional evidence may be adduced at trial which would be helpful in the disposition of the case. See M. Snower & Co. v. United States, 140 F.2d 367, 369 (7th Cir. 1944).

The proper procedure is to assess the merits of each summary judgment motion independently. See 10A Charles Alan Wright et al. § 2720 at 335-37. Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to a judgment as a matter of law. Id. The fact that one party fails to satisfy that burden on its own motion does not automatically indicate that the opposing party has satisfied its burden and must be granted summary judgment on the other motion. Id.

### III. FACTUAL BACKGROUND[2]

Plaintiff was incarcerated at Dodge Correctional Institution (DCI) at all times relevant. Defendant Scott A. Hoftiezer is employed as the Physician Supervisor at DCI.

Plaintiff was admitted to DCI on February 19, 2004. On March 3, 2004, he saw nurse Peggy Keuler for an intake exam. At that time, plaintiff complained of pelvic pains. Ms. Keuler conducted a full exam and determined that plaintiff had chronic prostatitis and prescribed him an antibiotic treatment with Bactrim.

---

[2] The facts in this section are derived from plaintiff's verified complaint and affidavit, to the extent they are undisputed, and defendant's proposed findings of fact and affidavit, to the extent they are undisputed. See Civil L.R. 56.2 (E.D. Wis.)

5

**Treatment during April, 2004**

Approximately one month later, on April 2, 2004, plaintiff was seen by nurse Denise Bonnett, at which time he complained of a multi-year history of pain in his lower left abdominal quadrant (LLQ). On exam, plaintiff's vital signs were normal and his abdomen was unremarkable. Plaintiff refused a prostate check. A tentative diagnosis of possible irritable bowel syndrome was put forth and tests for Helicobacter Pylori were done as well as a stool occult blood. Plaintiff was prescribed Metamucil for constipation.

**Treatment during May, 2004**

Plaintiff followed up with nurse Bonnett on May 12, 2004. On that date, plaintiff complained of LLQ pain, which had been present for over two and a half years. The pains were associated with stooling and were described by plaintiff as crampy. A repeat exam of plaintiff's abdomen demonstrated LLQ tenderness and a mass in the LLQ that felt like a large amount of stool. Plaintiff again refused a rectal exam. At this appointment, plaintiff was assessed with possible irritable bowel syndrome and he was advised to keep a pain diary and follow up with a doctor in one week.

On May 21, 2004, Dr. Steven Goewy treated plaintiff for complaints of persistent pain in his LLQ. No vomiting was reported and plaintiff stated that he only experienced nausea after drinking coffee. Plaintiff reported no sleeping problems and he indicated that he was taking Ibuprofen and Tylenol daily to treat his symptoms. An exam showed no acute distress and numerous physical attributes, such as his eyes and ears, were unremarkable. However, Dr. Goewy determined that plaintiff had a left inguinal hernia. Therefore, an order

6

was written for an appointment to be scheduled with a surgeon. Dr. Goewy ordered a lower bunk and a twenty pound weight lifting restriction for plaintiff.

**Treatment during June, 2004**

Defendant Dr. Hoftiezer first saw plaintiff on June 7, 2004. At that visit, plaintiff complained about pain from a hernia in the left inguinal area that radiated to his left testicle and back. Plaintiff described his pain as crampy and indicated that the pain worsened by straining to stool. He reported no change in the pain despite treatment with Metamucil, Bactrim, Clindamycin, Ibuprofen and Indocin.

Dr. Hoftiezer palpated plaintiff's left inguinal canal and felt no hernia. Plaintiff refused a rectal exam, but Dr. Hoftiezer noted that his blood count was normal, as was his urinalysis, and stool samples were negative for blood. An x-ray showed a large amount of stool in the colon and increased gas in the left colon.

Dr. Hoftiezer's assessment on June 7, 2004, was that plaintiff had colicky abdominal pain due to a somewhat chronically full colon. Dr. Hoftiezer treated plaintiff with a single dose of the laxative Magnesium Citrate, took him off work for forty-eight hours and scheduled him for another appointment in less than a week.

On June 11, 2004, Dr. Hoftiezer saw plaintiff again, at which time he complained of pain that went away for a little while but had returned unchanged. At that visit, plaintiff had normal vital signs. Dr. Hoftiezer noticed that plaintiff's left inguinal ring was tender and that palpation reproduced his pain.

Dr. Hoftiezer's assessment on June 11, 2004, was that plaintiff had left inguinal ring pain. He prescribed a high dose of Acetaminophen and ordered that an appointment with the University of Wisconsin (UW) general surgeon be scheduled.

7

Case 2:05-cv-00676-LA   Filed 03/03/08   Page 7 of 20   Document 53

Thereafter, on June 17, 2004, plaintiff was seen by nurse Elizabeth Feldman for complaints of left abdominal pain, left inguinal pain and inability to work due to pain. Plaintiff was taken off work for three weeks and was given Ibuprofen in addition to Acetaminophen to control pain.

On June 30, 2004, in response to a note from plaintiff that the Ibuprofen was too weak, Dr. Pavelsak prescribed Naproxen 500 to be taken twice a day. And, on July 9, 2004, Dr. Hoftiezer re-ordered the Naproxen and Metamucil and informed plaintiff that his appointment with the surgeon was forthcoming.

**Treatment during July, 2004**

On July 10, 2004, plaintiff was seen by nurse Judy Winscher for complaints of increased pain and mucous in his stool. Plaintiff presented holding his left side. Plaintiff was taken off work until his hernia was addressed by the UW surgeon. On July 12, 2004, in response to a note from plaintiff that the Naproxen was not working, Dr. Hoftiezer switched him to another class of Non-Steroid Anti-inflammatory drug painkiller, Indomethacin.

Plaintiff was seen by nurse Marsha Brightman on July 20, 2004, for complaints of dizziness. Brightman elicited a history of plaintiff blacking out after standing quickly, then sitting and feeling better. Plaintiff reported that Ibuprofen, Naproxen and Tylenol did not alleviate his pain. At that time, plaintiff was assessed as having a hypotensive episode due to inadequate fluid and food intake, pain due to a possible hernia, chronic tension headaches and depression due to health worries. Nurse Brightman's plan of treatment was to increase fluids and food intake, repeat blood count testing, initiate EKG testing to rule out other disease processes and educate plaintiff about headaches and relaxation techniques

8

to treat them. A referral to clinical services regarding depression symptoms was made. Additionally, plaintiff was given Elavil for headaches and Salsalate for acute pain. Further stool testing was ordered to evaluate for possible bleeding into the gastrointestinal tract. A follow-up appointment was scheduled for two weeks later.

**Treatment during August, 2004**

Plaintiff saw nurse Brightman for a follow-up appointment on August 3, 2004. At that time, plaintiff reported no additional blackouts and was drinking lots of fluids. He indicated that he had experienced only two headaches since his last visit on July 20, 2004. Plaintiff denied any gastrointestinal upset and his vital signs were normal. Nurse Brightman assessed plaintiff as having resolved dehydration issues and improved chronic headaches. Plaintiff was ordered to continue on a lower bunk.

On August 17, 2004, plaintiff was seen by Dr. Michael J. Black, a UW surgeon. Dr. Black diagnosed plaintiff has having a possible left inguinal hernia. Therefore, Dr. Black scheduled a herniogram for plaintiff.

On August 27, 2004, plaintiff was seen by Dr. Mohammed Samara to review Dr. Black's findings. At that time, plaintiff still suffered inguinal pain, which increased when straining or taking long walks. Plaintiff's vital signs were normal and Dr. Samara assessed him as having a left inguinal hernia to be ruled out by a herniogram.

**Treatment during October, 2004**

Plaintiff underwent a herniogram at UW on October 6, 2004, which revealed a small left inguinal hernia. On October 19, 2004, plaintiff was again seen at UW. At that time, the

9

diagnosis of left inguinal hernia pain was confirmed and hernia repair was suggested. The next day, Dr. Hoftiezer ordered that the surgery be scheduled at the earliest convenience.

**Treatment during November, 2004**

Plaintiff wrote a note to the Health Services Unit on November 14, 2004, requesting that his Elavil be increased because it was not as effective as it had been. Plaintiff also stated that he was waiting for hernia surgery. The next day, Dr. Hoftiezer increased plaintiff's Elavil prescription from 25 milligrams to 50 milligrams. And, plaintiff was continued on Metamucil and Salsalate for constipation and pain.

On November 26, 2004, plaintiff was seen by nurse Barb Reitman for complaints of worsening constipation and pain with straining to stool. Plaintiff noted bleeding after a successful bowel movement. Plaintiff was given hemorrhoid ointment and a stool softener and a physician follow-up was scheduled.

Plaintiff next saw Dr. Hoftiezer on November 29, 2004, at which time he asked about his hernia repair and stated that he was having the same pain. Plaintiff did not report nausea, vomiting or any rectal complaints. Plaintiff was assessed with "left inguinal hernia by herniogram with left inguinal pain." (Hoftiezer Aff. ¶ 37). The plan was to get a timely appointment at UW or, if this was not possible, to arrange for the procedure to be performed locally.

**Treatment during December, 2004**

On December 29, 2004, plaintiff informed the Health Services Unit (HSU) that he was vomiting, had pain with straining at stool and blood after bowel movements. Plaintiff was to be seen by Dr. George Daley. Plaintiff was told that because this was a new issue, he

10

would be required to pay a co-pay. However, plaintiff refused to sign a co-payment form and, therefore, was not seen in the HSU.

**Treatment during January, 2005**

Plaintiff underwent outpatient hernia repair at the University of Wisconsin on January 20, 2005. The next day, plaintiff was evaluated at DCI and no complications were noted. However, on January 22, 2005, plaintiff reported vomiting and pain with attempting to pass stool. On January 23 and 24, 2005, plaintiff was checked and found to be doing well. He was ordered to abstain from working and to continue to take Vicodin for pain.

**Treatment during February, 2005**

On February 1, 2005, plaintiff wrote a note reporting that he still had the pain he experienced prior to his hernia repair. Plaintiff was seen by Dr. Daley on February 4, 2005. (Hoftiezer Aff. ¶ 46). At that time, plaintiff complained of left testicle pain and post-operative discomfort. Dr. Daley, who had repaired countless hernias, noted that the wound was healing well. He assessed plaintiff as having post-operative discomfort.

Plaintiff wrote to the Health Services Unit on February 13, 2005, complaining that he had not gotten relief from his surgery. Plaintiff received a note in response, advising him that he would be seeing his surgeon at UW in the near future.

On February 14, 2005, plaintiff was seen by nurse Roberta Last for his annual review. At that time, plaintiff stated that he still had left inguinal and testicular pain.

Plaintiff submitted a Health Services Request on February 15, 2005, asking to be seen by a doctor who specializes in his type of medical conditions. Nurse Holly Puhl responded that plaintiff would soon see his surgeon at the University of Wisconsin.

11

On February 17, 2005, Dr. Hoftiezer, upon reviewing plaintiff's chart, restarted him on Vicodin three times a day as needed for pain. Dr. Hoftiezer noted the upcoming appointment with the surgeon, and he ordered a follow up appointment at DCI after plaintiff's appointment with the surgeon. Plaintiff was transferred from DCI to New Lisbon Correctional Institution on February 21, 2005. Dr. Hoftiezer had no further contact with plaintiff after this date.

### IV. ANALYSIS

Defendant Dr. Hoftiezer asserts three defenses in his motion for summary judgment. First, Dr. Hoftiezer claims that he was not deliberately indifferent to plaintiff's serious medical need. Second, he maintains that he was not personally involved in the decision to deny plaintiff medical care when he failed to sign the co-payment form. Finally, Dr. Hoftiezer submits that he is entitled to qualified immunity.

Plaintiff alleges that Dr. Hoftiezer violated his rights under the Eighth Amendment by: (1) scheduling a hernia surgery that was never performed; (2) delaying plaintiff's hernia surgery; (3) ignoring plaintiff's request to see a specialist; and (4) denying plaintiff medical care when he refused to sign a co-payment agreement. To establish liability under the Eighth Amendment, a prisoner must show: (1) that his medical need was objectively serious; and (2) that the official acted with deliberate indifference to the prisoner's health or safety. Farmer v. Brennan, 511 U.S. 825, 834 (1994); Chapman v. Keltner, 241 F.3d 842, 845 (7th Cir. 2001); see also Estelle v. Gamble, 429 U.S. 97, 104-05 (1976); Zentmyer v. Kendall County, 220 F.3d 805, 810 (7th Cir. 2000). In the present case, the parties do not dispute that plaintiff suffered a serious medical need. Therefore, the relevant inquiry is whether Dr. Hoftiezer was deliberately indifferent to this need. See Farmer, 511 U.S. at 834.

12

A prison official acts with deliberate indifference when "the official knows of and disregards an excessive risk to inmate health or safety." Id. at 837. Prison officials act with deliberate indifference when they act "intentionally or in a criminally reckless manner." Tesch v. County of Green Lake, 157 F.3d 465, 474 (7th Cir. 1998). Neither negligence nor even gross negligence is a sufficient basis for liability. See Salazar v. City of Chicago, 940 F.2d 233, 238 (7th Cir. 1991). A finding of deliberate indifference requires evidence "that the official was aware of the risk and consciously disregarded it nonetheless." Chapman, 241 F.3d at 845 (citing Farmer, 511 U.S. at 840-42).

First, plaintiff alleges that Dr. Hoftiezer diagnosed him as having an inguinal hernia and that surgery was scheduled for August of 2004, but was never performed. Plaintiff also alleges that Dr. Hoftiezer cancelled his August 17, 2004, UW appointment. However, the evidence in the record does not show that Dr. Hoftiezer cancelled any appointment. Instead, it shows that plaintiff misconstrued Dr. Hoftiezer's order to schedule an appointment with a surgeon as an indication that he was to have surgery at that appointment. And while it is true that plaintiff did not undergo surgery in August of 2004, plaintiff does not dispute that he saw Dr. Black for a surgical consultation at UW on August 17, 2004, as scheduled. Thus, there does not appear to be a genuine issue of material fact, but merely a misunderstanding, with regard to the August, 2004 appointment. Plaintiff was diagnosed with a possible inguinal hernia at that appointment, but had to undergo further testing–a herniogram–to confirm the diagnosis before surgery could even be considered as an appropriate treatment. Once the herniogram confirmed the existence of the hernia, Dr. Hoftiezer ordered surgery to be scheduled, and plaintiff indeed underwent outpatient hernia repair at UW on January 20, 2005. Thus, the evidence in the record does not support plaintiff's first two arguments;

13

rather, it shows that Dr. Hoftiezer sought outside confirmation of the existence of a hernia, one which he could not confirm through physical palpation, before scheduling hernia repair surgery.

Next, plaintiff avers that Dr. Hoftiezer delayed his hernia repair. A delay in treating a painful medical condition that is not life-threatening can support an Eighth Amendment claim. Gutierrez v. Peters, 111 F.3d 1364, 1371 (7th Cir. 1997). "In cases where prison officials delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm." Williams v. Liefer, 491 F.3d 710, 715 (7th Cir. 2007); Langston v. Peters, 100 F.3d 1235, 1240 (7th Cir. 1996) (to establish the effect of a delay, "an inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed."). Expert testimony that the plaintiff suffered because of a delay in treatment satisfies this requirement. Williams, 491 F.3d at 715. Similarly, an inmate's testimony, medical records, and treatment are sufficient medical evidence if they show that the delay "exacerbated plaintiff's condition or otherwise harmed him." Id.

Although far from clear, it appears that plaintiff is complaining that the three-month delay between the date his hernia repair was ordered and the date it was performed violated his Eighth Amendment rights. It is undisputed that plaintiff submitted no expert testimony to show that he was adversely affected by the delay. See Williams, 491 F.3d at 715. However, I will review plaintiff's medical records to determine whether they demonstrate that the delay exacerbated his condition or otherwise harmed him. See id.

14

Plaintiff's hernia repair was first suggested by Dr. Black on October 19, 2004. On October 20, 2004, Dr. Hoftiezer ordered that the surgery be scheduled at the earliest convenience. Plaintiff ultimately underwent hernia repair on January 20, 2005.

Between October 20, 2004, and January 20, 2005, plaintiff was seen in the HSU on four occasions for complaints of pain while stooling, headaches and inguinal ring pain. Plaintiff was given Elavil, Metamucil and Salsalate for his various conditions.

Based on the slim record before me, I cannot conclude that there is verifying medical evidence sufficient to establish that the delay in hernia repair excerbated plaintiff's hernia condition. Plaintiff successfully underwent a hernia repair without complication, and subsequent examinations noted that plaintiff was recovering well from that operation with only routine post-operative discomfort. Thus, the only harm suggested by the record is the pain plaintiff experienced while awaiting surgery. However, the record clearly demonstrates, and plaintiff does not argue otherwise, that defendant Hoftiezer was not in any manner indifferent to plaintiff's complaints of pain. Rather, plaintiff's medical history reveals that prison officials, including Hoftiezer, promptly responded to his requests for treatment while he was awaiting the hernia repair. The evidence therefore does not support a finding that Dr. Hoftiezer ignored his requests for medical care with respect to his pain symptoms, see Chapman, 241 F.3d at 845, or, again, that the course of treatment that plaintiff received exacerbated his inguinal hernia or otherwise harmed him. See Williams, 491 F.3d at 715. Nor is there any indication that plaintiff experienced an "acute or escalating situation" that Dr. Hoftiezer ignored. See Beyerbach v. Sears, 49 F.3d 1324, 1326 (8th Cir. 1995) (abrogated on other grounds) (holding that at summary judgment plaintiff could not prevail on Eighth Amendment claim where he "failed to present any 'verifying medical evidence' that

15

defendants 'ignored an acute or escalating situation' or that delays adversely affected his prognosis[.]").

Apparently, plaintiff believes that his hernia repair surgery deserved to be given higher priority. However, there is no evidence that suggests that Dr. Hoftiezer was somehow responsible for the delay. See O'Malley v. Litscher, 465 F.3d 799, 806 (7th Cir. 2006) (holding that half-hour delay in wiping vomit from the plaintiff's back was not deliberate indifference because it was due to a shift change, not a disregard of the plaintiff's condition). Plaintiff seems to believe that Dr. Hoftiezer caused the delay because he cancelled plaintiff's surgery appointment at UW on August 17, 2004. As discussed, supra, Dr. Hoftiezer did not cancel the appointment, which was for a surgical consultation. Plaintiff also avers that on November 29, 2004, Dr. Hoftiezer stated that if the appointment was not scheduled soon, plaintiff would be treated by another doctor. It is unclear how this, alone establishes that Dr. Hoftiezer was deliberately indifferent to plaintiff's condition. Rather, it suggests that Dr. Hoftiezer was concerned about getting plaintiff's hernia repaired in a timely fashion. Hoftiezer consistently ordered the appointments with UW physicians to be scheduled at the UW facility's earliest convenience, and nothing in the record indicates he was trying to hinder plaintiff's hernia surgery or otherwise responsible for any delay. And in the meantime, the record indicates that Hoftiezer was prompt in attending to plaintiff's complaints of pain and other symptoms.

To the extent that failure to provide plaintiff with an immediate hernia repair was medically erroneous, a mistake in a medical judgment, without more, cannot be characterized as disregard for an excessive risk to inmate health or safety. Farmer, 511 U.S. at 837. That is, "inadvertent failure to provide adequate medical care", or a "negligent

16

. . . diagnos[is]", simply fails to establish the requisite culpable state of mind. Wilson v. Seiter, 501 U.S. 294, 297 (1991) (quoting Estelle, 429 U.S. at 105 & 106 (holding that the Eighth Amendment is not a vehicle for bringing claims for medical malpractice)); see also Sellers v. Henman, 41 F.3d 1100, 1102 (7th Cir. 1994) (stating that ordinary malpractice is not cruel and unusual punishment); Sivard v. Pulaski County, 959 F.2d 662, 669 (7th Cir. 1992) (holding that simple malpractice does not create a claim for relief under the Eighth Amendment).[3]

Similarly, any wrongdoing on behalf of Dr. Hoftiezer that can be attributed to negligence also fails under the Eighth Amendment because deliberate indifference is not negligence, nor is it gross negligence. Haley v. Gross, 86 F.3d 630, 644 (7th Cir.1996); Thomas v. Farley, 31 F.3d 557, 558 (7th Cir. 1994) (negligence is not actionable in suit under 42 U.S.C. § 1983 complaining about the infliction of cruel and unusual punishment). Instead, deliberate indifference requires a certain culpable mental state comparable to criminal recklessness, Wilson, 501 U.S. at 302, which is not borne out by the evidence on file in this case. Any delays in treating plaintiff, even if negligent, simply are not the type of deliberate indifference which the Eighth Amendment prohibits. See Martin v. Tyson, 845 F.2d 1451, 1458 (7th Cir.1988).

Next, plaintiff avers that Dr. Hoftiezer was deliberately indifferent to his serious medical need when he ignored plaintiff's requests to see a specialist. It is undisputed that

---

[3] I note that plaintiff claims that it was medically erroneous for Dr. Hoftiezer to prescribe him a high dose of acetaminophen on June 11, 2004, because this medication can cause liver failure. Plaintiff was not allowed to proceed on such claim. Regardless, this allegation fails to implicate the Constitution because at most plaintiff accuses Dr. Hoftiezer of medical malpractice, which is not actionable under the Eighth Amendment. See Estelle, 429 U.S. at 105 & 106.

17

plaintiff asked to be seen by a specialist on February 15, 2005, approximately one month after his hernia repair. Nurse Puhl, who is not a named defendant, responded that plaintiff would be soon be seen seeing his surgeon at UW.

Section 1983 does not create a claim based on collective or vicarious responsibility. See Pacelli v. deVito, 972 F.2d 871, 875 (7th Cir. 1992). To establish liability under 42 U.S.C. § 1983, a plaintiff must prove that a defendant was in some way personally responsible for the alleged deprivation, and that the deprivations occurred with the knowledge and consent of that defendant. See Black v. Lane, 22 F.3d 1395, 1401 (7th Cir. 1994); Smith v. Rowe, 761 F.2d 360, 368-69 (7th Cir. 1985). An official is personally involved if: a) he or she participates directly in the constitutional deprivation; b) acts or fails to act with reckless disregard of plaintiff's constitutional rights; or c) the conduct that deprived plaintiff of his constitutional rights occurred at the official's direction or with his or her knowledge and consent. Rascon v. Hardiman, 803 F.2d 269, 274 (7th Cir. 1986); Smith, 761 F.2d at 369; Crowder v. Lash, 687 F.2d 996, 1005 (7th Cir. 1982).

In the present case, there is no evidence that plaintiff's request to see a specialist was addressed to Dr. Hoftiezer or that Dr. Hoftiezer had any role in responding to the request. Additionally, there is no indication that Dr. Hoftiezer knew of and consented to the denial of plaintiff's request. Based on this, I am not persuaded that Dr. Hoftiezer was personally involved in the decision to deny plaintiff's request to see a specialist.

Next, plaintiff avers that Dr. Hoftiezer denied him medical care when he refused to sign a co-payment form. In prisons, since inmates are deprived of the ability to seek health care on their own, the state is obligated to provide basic health care. Witkowski v.

18

Milwaukee County, 480 F.3d 511, 513 (7th Cir. 2007). As the Supreme Court explained in DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 199-200 (1989):

> [W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being . . . . The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs - e.g., food, clothing, shelter, medical care, and reasonable safety - it transgresses the substantive limits on state action set by the Eighth Amendment of the Due Process Clause.

It is undisputed that on December 29, 2004, plaintiff informed the HSU that he was vomiting, had pain with straining at stool and blood after bowel movements. Plaintiff was scheduled to be seen by Dr. George Daley. When he was told that he would be required to pay a co-pay because he presented with a new medical condition, plaintiff refused to sign the co-payment form. Therefore, he was not seen in the HSU on December 29, 2004.

Although it is unclear whether plaintiff's medical complaints on December 29, 2004 were new conditions warranting a co-payment, the evidence on file does not support a finding that Dr. Hoftiezer was involved in the decision to deny him medical care. Specifically, there is no evidence to show that Dr. Hoftiezer participated directly in the decision to deny plaintiff treatment or that medical care was denied at Dr. Hoftiezer's direction or with his knowledge and consent. See Rascon, 803 F.2d at 274. Rather, it appears that the decision was made by Dr. Daley and HSU staff.

As a final matter, Dr. Hoftiezer contends that he is entitled to qualified immunity. However, when a court determines in a § 1983 case that no constitutional violation occurred, it is unnecessary to consider whether defendants are entitled to qualified immunity. Phillips

19

v. City of Milwaukee, 123 F.3d 586, 597(7th Cir. 1997) (citing Kraushaar v. Flanigan, 45 F.3d 1040, 1049 n. 4 (7th Cir. 1995)).

In sum, there is no genuine issue of material fact as to plaintiff's Eighth Amendment claims against Dr. Hoftiezer, and Dr. Hoftiezer is entitled to judgment as a matter of law on those claims. Consequently, I will grant Dr. Hoftiezer's motion for summary judgment and deny plaintiff's motion for summary judgment.[4]

## V. CONCLUSION

**For the foregoing reasons,**

**IT IS ORDERED** that defendant Dr. Hoftiezer's motion for summary judgment (Docket # 41) is **GRANTED.**

**IT IS FURTHER ORDERED** that plaintiff's motion for summary judgment (Docket #46) is **DENIED**.

**IT IS FURTHER ORDERED** that plaintiff's motion to appoint counsel (Docket # 52) is **DENIED AS MOOT.**

**IT IS ORDERED** that this action is **DISMISSED.**

Dated at Milwaukee, Wisconsin, this 3 day of March, 2008.

/s_____
LYNN ADELMAN
District Judge

---

[4] On October 9, 2007, plaintiff filed a motion for appointment of counsel. As defendants' motion for summary judgment has been granted, I will deny plaintiff's motion to appoint counsel as moot.

20